IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TIM CAESAR BLANKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:24CV588 |
| | ) | |
| SGT. CAPEL, OFC. JASMINE | ) | |
| BREWINGTON, OFC. J. RICKERS, | ) | |
| and LT. ANGELA SESSOMS, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER, MEMORANDUM OPINION, AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Tim Caesar Blanks alleges that, while he was an inmate at Scotland Correctional Institution ("SCI") in February 2024, Sergeant Caple,[1] on Officer J. Ricker's[2] order, pepper sprayed him while he was handcuffed inside a locked cell and Lieutenant Sessoms instructed officers to leave Blanks in the cell for ten minutes after the incident. And, according to Blanks, none of this would have happened had Officer Brewington not reported his earlier agitated behavior. He now brings this Section 1983 action alleging violations of his Eighth Amendment rights.

Specifically, Blanks alleges that Caple used excessive force when she deployed the pepper spray; Ricker used excessive force by threatening to use her pepper spray, ordering Caple

to use hers, and failing to stop Caple from doing so; and Sessoms showed deliberate indifference to Blanks's serious medical needs when she instructed officers to leave him in his cell after the incident for ten minutes.

This matter is before the Court on the parties' cross-motions for summary judgment. Pl.'s Mot. for Summ. J., Docket Entry 60; Def. Caple Mot. for Summ. J., Docket Entry 61; Sessoms, Brewington, and Ricker's Mot. for Summ. J., Docket Entry 64.

Although Blanks characterizes his motion as one for summary judgment, in fact, he argues against granting summary judgment due to the existence of genuine material disputes. On the other hand, the defendants argue that the undisputed

---

[1] Capel's name is spelled Caple.

[2] Defendant Rickers's name is spelled Ricker.

evidence shows they are not liable for violating Blanks's constitutional rights and that they are each entitled to qualified immunity.

For the reasons set forth below, the Court should grant the defendants' summary judgment on the official capacity claims against them. The Court should deny Blanks's motion and Caple's motion. The Court should grant summary judgment for Brewington and Sessoms and grant in part and deny in part summary judgment for Ricker. The Court should grant qualified immunity for Brewington and Sessoms and deny qualified immunity for Caple and Ricker.

I.   FACTS

The undisputed facts show that Blanks was an inmate housed in the mental health block/Blue Unit at SCI on February 6, 2024. *See* Def. Ricker's Resps. to Pl.'s First Set of Reqs. for Admis., Docket Entry 62-7. That night, correction officer III Brewington was overseeing the unit. Ricker, a correctional officer I, and Caple, a correctional sergeant III, were also on duty elsewhere at SCI that night. *See* Sgt. Brewington Decl. ¶¶ 4, 6 (Nov. 7, 2025), Docket Entry 65-1; Officer Ricker Decl. ¶ 4 (Nov. 6, 2025), Docket Entry 65-2; Charlene Nicole Caple Decl. ¶ 2 (Nov. 6, 2025), Docket Entry 62-5.

At approximately 10:00 p.m., Blanks was agitated because Brewington would not release him from his cell to assist with janitorial work, prompting Brewington to call for assistance. Brewington Decl. ¶¶ 8, 10; Dismissal Ltr. at 5, Docket Entry 62-4. Ricker and Caple responded to the unit. Brewington Decl. ¶ 12. Ricker placed Blanks in handcuffs through the wicket door of his cell before she and Caple escorted him to a holding cell in the Red Unit. Ricker Decl. ¶ 6. Brewington did not follow Caple, Ricker, or Blanks to the Red Unit, nor did she see Blanks for the remainder of her shift. Brewington Decl. ¶ 13.

On the way to the Red Unit, Ricker tried to calm Blanks by reminding him that he had never caused her any problems previously and just needed to cool off. Ricker Decl. ¶ 7.

Upon arrival at the Red Unit, Ricker placed Blanks, still handcuffed, in a locked holding cell. *Id.* ¶ 8; Dismissal Ltr. at 5. Blanks was yelling. Dismissal Ltr. at 5. At 10:05 p.m., Caple took out her pepper spray canister and administered a burst of pepper spray through the holding cell door. Ricker Decl. ¶ 10; Incident R. at 2, Docket Entry 67-10.

Lieutenant Sessoms, a correctional lieutenant III at SCI supervising the Gray Unit that night, responded to a call that a use of force incident had occurred in the Red Unit. Lt. Sessoms Decl. ¶¶ 3-7 (Nov. 5, 2026), Docket Entry 65-3.

Ricker remained in the corridor watching Blanks while Caple went to the sergeant's office on the unit. Incident R. at 2. Caple told Sessoms she had used OC pepper spray on

Blanks. Sessoms Decl. ¶ 7. One minute later, Caple returned to the cell, followed by Sessoms who kept a visual on Blanks. Incident R. at 2. Sessoms did not authorize any use of force against Blanks that day and did not know or have reason to know that Caple would administer pepper spray on Blanks. Sessoms Decl. ¶ 13.

At 10:09 p.m., correctional sergeant III Jarred Gholston, correctional sergeant III David Graham, and correctional sergeant III Lenwood Graham escorted Blanks from the cell to the showers for decontamination. Witness Statements at 2, 9, 10, Docket Entry 67-6. They gave him a fresh set of clothes and took him out of the Red Unit at 10:25 p.m. *Id.* at 2, 9, 10; Incident R. at 3.

At 10:51 p.m., correctional sergeant III Antonio Tolbert and correctional officer III T. Nguyen escorted Blanks from his cell to the medical exam room for assessment and back to his holding cell three minutes later. *Id.* at 3; Witness Statements at 4, 12.

As required, Sessoms investigated the use of force incident, obtained witness statements, and prepared an incident report. Sessoms Decl. ¶ 9. She concluded that

> [a]ll policies and procedures were not followed for this type of incident due to Sergeant Caple not providing a reason for administering OC Pepper Spray, not providing the direct order that was given. Sergeant Caple was asked to provide a

statement detailing what direct order was given twice and refused to provide a detailed statement. Upper management has been notified.

Incident R. at 4.

However, M. Parsons, the Facility Approver of the Incident Report, reviewed the report and concluded that "staff followed all policies and procedures we have in place for this type of incident. Only the amount of force was used to get the situation under control." *Id.* at 5.

The North Carolina Department of Adult Correction terminated Caple's employment, effective July 4, 2024. Dismissal Ltr. Her dismissal was related to two use-of-force incidents, one on November 5, 2023 and the February 6, 2024 incident involving Blanks "while he was restrained in handcuffs in a locked holding cell." *See id.* (detailing witness statements made as a part of the investigation into the February 6 incident).

The dismissal letter explained that she "administered a burst of pepper spray at the offender when he was restrained in a holding cell, and he did not otherwise pose a threat to himself or others. Force is not allowed to be used against a properly restrained offender and the use of pepper spray on Blanks was not reasonably necessary to carry out a proper

correctional objective." *Id.* at 8.[3]

The dismissal letter also reported other correctional officers who witnessed the February 6 incident and stated that they would not have sprayed Blanks because he was in handcuffs in a locked cell and not posing a threat to himself or staff. *See generally id.* at 4-6.

But the parties dispute Blanks's conduct that led Brewington to call for assistance that night, his refusal to obey orders once inside the cell in the Red Unit, the extent of his injuries, and Sessoms' directions upon learning of the incident. *See generally* Brewington's Decl. (describing Blanks's kicking, yelling, and threat to her precipitating her call for assistance); Pl.'s [Verified] Br. in Supp. of Pl.'s Mot. for Summ. J. ("Verified Br. in Supp."), Docket Entry 70 (claiming Blanks did not pose a threat to staff, himself, property, or other inmates at the time Caple administered pepper spray; describing treatment for injuries he sustained, nightmares, and aggravation of PTSD; and claiming that Sessoms instructed Ricker to leave him in the cell for ten minutes); Dismissal Letter (stating that Blanks did not pose a threat to himself or others); Def. Ricker's Resps. to Pl.'s First Set of Reqs. for Admis. (denying that Blanks was not acting violently or disruptively when Caple used force against him and stating that "medical"

cleared Blanks); Ricker Decl. (describing Blanks's erratic and aggressive behavior and threatening statements to Ricker and Caple once in the Red Unit holding cell); Incident R. (noting Blanks's refusal to obey Ricker's orders); Def. Caple's Resps. to Pl.'s Interrogs., Docket Entry 67-18 (responding that Blanks refused orders and verbally threatened staff).

## II.    STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023). The moving party bears the burden of establishing the absence of a genuine dispute of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrates the absence of a genuine issue of material

---

[3] "Not every violation of prison policy is a violation of the constitution." *King v. Riley*, 76 F.4th 259, 267 (4th Cir. 2023).

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56).

"An affidavit or declaration used to support [summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

A party generally cannot rely on statements in a brief to support a motion for summary judgment, because they are not evidence. *City of Greensboro v. Guilford Cnty. Bd. of Elections*, No. 15-CV-559, 2017 WL 11488724, at *1 n.4 (M.D.N.C. Jan. 26, 2017) (collecting cases); *see also Hill v. Carvana, LLC*, No. 22-CV-37, 2022 WL 1625020, at *3 (M.D.N.C. May 23, 2022).

However, persuasive authority supports consideration of a *pro se* party's verified submissions to the court, including briefs, at the summary judgment stage. *See, e.g.*, *Jones v. Perry*, No. 9:21CV1822, 2022 WL 16952240, at *5 n.4 (D.S.C. Oct. 27, 2022), *adopted*, 2022 WL 16951990 (Nov. 15, 2022) (stating that "a pro se litigant's . . . verified submission must be considered as an affidavit and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on

personal knowledge"). *Cf. Jones v. Harrell*, No. 7:21-cv-541, 2025 WL 2712429, at *2 n.3 (W.D.N.C. Sept. 23, 2025) (not permitting pro se plaintiff to rely on his brief to oppose summary judgment because it was not verified); *McAllister v.* Johnson, No. 1:10-CV-13, 2023 WL 8604205, at *1 (M.D.N.C. Apr. 4, 2023) ("To the extent his brief contains factual assertions, those assertions are not verified and have no evidentiary value.").

"'When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *TC Heartland LLC v. Schiffman*, No. 1:23-CV-665, 2026 WL 1785093, at *1 (M.D.N.C. June 22, 2026) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)), *appeal docketed*, No. 26-1912 (4th Cir. July 16, 2026). "'When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Id.* (quoting *Rossignol*, 316 F.3d at 523).

### III. GOVERNING LAW

Title 42, United States Code, Section 1983 "is a federal statutory remedy available to those deprived of rights secured to them by the Constitution and, in a more sharply limited way, the statutory laws of the United States" by persons acting under color

of state law. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). A plaintiff bringing suit pursuant to § 1983 must show that a person acting under color of state law violated a Constitutional or other federal legal right. *West v. Atkins*, 487 U.S. 42, 48 (1988).

A. Excessive Force

Here, as against Caple, Rickers, and Brewington, the constitutional right at issue is the right to be free from an officer's use of excessive force, derived from the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 327 (1986); *see also Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) ("The Eighth Amendment . . . serves as the primary source of substantive protection to convicted prisoners in cases . . . where the deliberate use of force [by prison officials] is challenged as excessive and unjustified.").

A claim for the use of excessive force "involves both an objective and a subjective component." *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021).

"The objective component measures the nature of the force employed, asking whether that force 'was sufficiently serious to establish a cause of action.'" *Id.* (quoting *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019)). "This is not a high bar; de minimis or trivial force is not enough, but anything more will suffice." *Id.* (citing *Brooks*, 924 F.3d at 112).

"The more demanding . . . subjective component . . . asks a single question: whether the officers acted with a 'sufficiently culpable state of mind,'" *Dean*, 984 F.3d at 302 (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)), that is, "wantonness in the infliction of pain," *id.* "In contrast to the objective component, this is a demanding standard." *Brooks*, 924 F.3d at 112-13. The plaintiff must establish that the officer applied force "maliciously and sadistically for the very purpose of causing harm" rather than "in a good-faith effort to maintain or restore discipline." *Dean*, 984 F.3d at 302. For example, an officer acts in good faith when confronting "immediate risks to physical safety" and "compelling compliance with prison rules and procedures" to "preserve internal order." *Brooks*, 924 F.3d at 113 (citing *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *Bailey v. Turner*, 736 F.2d 963, 970 (4th Cir. 1984) ("rejecting rule that use of mace against recalcitrant inmate may be justified only by threat to physical safety")).

The United States Supreme Court recognized long ago that "corrections officials must make their decisions 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Hudson*, 503 U.S. at 6 (quoting *Whitley*, 475 U.S. at 320). They "must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates." *Id.* Accordingly, "'[p]rison administrators . . . should

6

be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Whitley*, 475 U.S. at 321-22). *See also* N.C. Dep't of Adult Correction, Use of Force Policy (Aug. 30, 2018) (authorizing the use of pepper spray as a "first level of response" "[t]o control or deter violent, threatening or aggressive acting offenders . . ."), Docket Entry 65-5.

But an officer crosses the line and acts maliciously and sadistically, for example, "when [she] inflict[s] pain . . . to punish an inmate for intransigence or to retaliate for insubordination," *Brooks*, 924 F.3d at 113-14, n.4 (citing cases finding a reasonable jury could infer the officer used excessive force in response to the inmate's use of profanity and threats of violence and other similar statements directed at officers), or "to punish or retaliate against an inmate for his prior conduct," *Dean*, 984 F.3d at 302, and possibly when the officer "use[s] force on an inmate who is restrained and compliant and posing no physical threat," *id.* (noting this conduct "raises the specter of such an impermissible motive"). "[I]t is a violation of the Eighth Amendment for prison officials to use mace, tear gas *or other chemical agents in quantities greater than necessary* or for the sole purpose of infliction of pain." *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting

*Williams*, 77 F.3d at 763 and stating that the phrase "or other chemical agents" "plainly reaches the use of pepper spray") (emphasis in original).

"[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 7). However, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.* at 38.

To determine the nature of the force, courts assess "[1] the need for application of force, [2] the relationship between that need and the amount of force used, [3] the threat 'reasonably perceived by the responsible officials,' and [4] 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

"If a reasonable jury could find, based on the inferences drawn under the *Whitley* factors or other evidence, that correctional officers used force maliciously to punish or retaliate against an inmate, then summary judgment [in favor of the officers] is not appropriate." *Dean*, 984 F.3d at 303-02.

7

### B. Deliberate Indifference of Serious Medical Needs

Here, as against Sessoms, the constitutional right at issue once again derives from the Eighth Amendment, but it involves alleged deliberate indifference to Blanks's serious medical needs.

"Claims that prison officials failed to provide adequate medical care to an inmate, like excessive force claims, sound in the Eighth Amendment." *Iko*, 535 F.3d at 241. A plaintiff must show that the officer "acted with 'deliberate indifference' (subjective) to the inmate's 'serious medical needs' (objective)." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

An officer acts with deliberate indifference when she has "*actual knowledge of the risk of harm* to the inmate" and also "'recognize[s] that *[her] actions were insufficient*' to mitigate the risk of harm to the inmate arising from his medical needs." *Id.* (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)) (emphasis in original).

Prison officials may act with deliberate indifference by "intentionally denying or delaying access to medical care . . . ." *Estelle*, 429 U.S. at 105. But "[m]ere delay is not enough." *Moskos v. Hardee*, 24 F.4th 289, 298 (4th Cir. 2022). "A commonplace medical delay such as that experienced in everyday life will only rarely suffice to constitute an Eighth Amendment violation, absent unusual circumstances where the delay itself places the prisoner at 'substantial risk of serious harm,' such as where the prisoner's condition deteriorates markedly or the ailment is of an urgent nature." *Id.*

### IV. DISCUSSION

#### A. The Court should grant summary judgment to the defendants in their official capacity on the basis of sovereign immunity.

At the time of the incident, each of the defendants was an employee of the North Carolina Department of Adult Corrections ("the Department"). *See* Caple Decl. ¶ 2; Ricker's Resps. to Pl.'s Interrogs. ¶ 2 (responding to question about "DPS" employment), Docket Entry 67-17; Brewington's Resps. to Pl.'s 1st Set of Interrogs. ¶ 2 (same), Docket Entry 67-15; Sessoms's Resps. to Pl.'s Interrogs. ¶ 2 (same), Docket Entry 67-20.

The Department "is a North Carolina agency." *Biggs v. N.C. Dep't of Pub. Safety*, 953 F..3d 236, 241 (4th Cir. 2020); *see also Dade v. FNU*

8

*Carlineo*, No. 1:22-cv-00125-MR, 2023 WL 2386777, at *2 n.3 (W.D.N.C. Mar. 6, 2023) ("The NCDPS is now known as the North Carolina Department of Adult Corrections (NCDAC).").

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and, thus, "is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). *Cf. id.* at 71 n.10 (recognizing, though, that "'official-capacity actions for prospective relief are not treated as actions against the State'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

Generally, the Eleventh Amendment bars actions against a state unless the state consents or Congress properly abrogates immunity. *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011). *Cf. Alden v. Maine*, 527 U.S. 706, 712-13 (1999) ("We have sometimes referred to the States' immunity from suit as 'Eleventh Amendment immunity[,] . . . [a] convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment. . . . [T]he States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . .").

Congress has not abrogated a state's immunity from suits arising under § 1983. *Biggs*, 953 F.3d at 241. And "North Carolina has not consented to being sued under § 1983 and therefore has not waived sovereign immunity in that context." *Singh v. Univ. of N.C. at Chapel Hill*, 659 F. Supp. 3d 659, 669 (M.D.N.C. 2023). Therefore, Blanks cannot seek damages against the defendants in their official capacities. And Blanks only requests money damages against the defendants. *See* Compl. § VI. For these reasons, the Court should grant summary judgment for the defendants on the official capacity claims.

B. The Court should deny Blanks's motion for summary judgment.

As the moving party seeking summary judgment, Blanks bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 at 325. But he has, by his own admission, failed to do so.

In his verified brief in support of his motion, Blanks describes the defendants' responses to interrogatories and requests for admissions as "squarely contradictory" to his declaration and affirmatively states that "[t]here is clearly a genuine issue of fact" and this "factual dispute is also material." *See* Verified Br. in Supp. at 5-6.

Indeed, the evidence does not permit the Court to determine as a matter of law that any of the defendants has violated Blanks's constitutional

9

rights. Therefore, Court should deny Blanks's motion.

C. The Court should deny summary judgment to Caple in her individual capacity.

Caple does "not contest that the use of pepper spray was non-trivial," Def. Caple Mem. of Law in Supp. of Mot. for Summ. J. ("Caple's Mem. in Supp."), Docket Entry 62 at 15, and, instead, argues that Blanks has not put forth evidence that she used force maliciously and sadistically.

To meet her burden as the moving party, Caple points out that multiple witnesses observed that Blanks had been "kicking his cell door, was openly hostile to staff, [and] was communicating threats to staff." *Id.* at 16 (citing Ex. 1, Offender Disciplinary Infraction; Ex. 2, Incident R.). And once in the holding cell in the Red Unit, he refused orders. *Id.* at 16-17 (citing Ex. 2; Ex. 4, Dismissal Letter; Ex. 5, Caple Decl.). In response to his refusal, she administered "a single short blast of OC peppery spray." *Id.* at 17-18 (citing Ex. 2; Ex. 4).

Thus, Caple argues that her tempered use of force was necessary because Blanks "was not docile and was refusing multiple lawful orders," a situation in which "corrections officers could reasonably perceive a danger . . . ." *Id.* at 22-23. The law recognizes that "inmates cannot be permitted to decide which orders they will obey, and when they will obey them." *Brooks*, 924 F.3d at 117. When an inmate resists, the officer is "permitted to take measures, including the use of appropriate force, intended to secure his cooperation." *Id.* at 118.

Caple further contends that the photographs of Blanks taken shortly after the incident, as well as his medical assessments, "blatantly contradict[]" Blanks's alleged injuries from the pepper spray. *Id.* at 18-19 (citing Ex. 2).

There is evidence to support Caple's position that the force was not malicious and sadistic, that is, it was "needed to preserve internal order and discipline," *see Hudson*, 503 U.S. at 6: Blanks himself admitted that he was agitated and yelling for Brewington to open his cell door when she would not let him out of his cell in the Blue Unit to help her clean. *See, e.g.*, Dismissal Letter at 5 (Blanks's witness statement). And, according to Ricker, once in the Red Unit holding cell, Blanks refused to follow her orders to turn around to allow her to remove his handcuffs and told her, "Fuck you, I'm not giving you shit." *See, e.g.*, Ricker Decl. ¶¶ 8-9; Dismissal Letter at 4.

Likewise, there is evidence that the extent of injury Blanks suffered suggests Caple plausibly thought the force exerted was necessary, *see Wilkins*, 559 U.S. at 37. Ricker reported as part of the incident investigation that, in response to Blanks's refusal, Caple administered one burst of pepper spray through the wicket door at waist level. *See, e.g.*,

10

Dismissal Letter at 5. Blanks even states that it is undisputed that Caple sprayed him at waist level. Pl.'s Statement of Undisputed Facts ¶ 6, Docket Entry 71. The color photographs of Blanks taken shortly after the incident show discoloration of the back of Blanks' shirt and his arms which were in handcuffs behind his back. Incident R. at 15-18. Gholston and David Graham reported that the spray hit Blanks in the back, which Blanks also acknowledged. *See, e.g.*, Dismissal Letter at 5.

The nurse who completed the medical assessment saw no injuries. *See, e.g.*, *id.* at 6. Blanks also admitted during the incident investigation that he suffered no injuries as a result of the incident. *See, e.g.*, *id.* at 5.

However, despite her argument otherwise, other evidence suggests there are genuine issues of material fact regarding the "malicious and sadistic" component. For example, after the incident, according to Correctional Captain Revels, Caple initially told her that she did not know why she sprayed Blanks. *See* Dismissal Letter at 4. Revels reported that Caple then told her that she sprayed Blanks because he refused to "give the handcuffs back." *Id.* Lenwood Graham reported that Caple also told him that she sprayed Blanks "because he would not give [her] the handcuffs." *Id.* at 5.

Furthermore, Ricker reported as part of the incident investigation that she did not use her pepper spray because,

although Blanks was angry and yelling, he was secure and did not pose a threat to anyone. *See, e.g.*, Dismissal Letter at 5. Gholston, who was standing fifteen feet away from the holding cell at the time of the incident, reported that Blanks was mad but did not kick the holding cell door and was not a security risk at the time of the incident. *Id.* Similarly, David Graham, who was standing six feet away from the cell at the time of the incident, reported that Blanks "did not kick the cell," was in handcuffs in a locked cell, and "was not posing a threat to himself or staff." *Id.*

As for where Blanks was hit with the spray, as part of the Unit Response investigation, Caple said she sprayed Blanks in "his facial area." Grievance Resp. at 1, Docket Entry 67-5. In his verified brief, Blanks claims that he was "summarily maced starting below his waist to his back and upper body," despite "offer[ing] no resistance" to officers immediately preceding the deployment of pepper spray. Blanks's Verified Br. in Supp. at 2.

On February 6, during a clinic encounter after the incident, Blanks reported that his hands burned a little bit and he had pain in his right hand. *See* Med. Recs. at 21, Docket Entry 68. Blanks contends he told the nurse that "his body felt like it was fire," he "couldn't move, see," and he "had trouble breathing." Verified Br. in Opp'n at ¶ 22, Docket Entry 72.

On February 9, Blanks wrote his therapist at SCI and explained that Caple deployed the pepper spray "start[ing] at my male body parts and worked her way up to my eyes and head," although he closed his eyes at the time. Med. Recs. at 13. The next day, he submitted a request to see his therapist, noting that his PTSD "kicked in" during the incident and he "suffered a panic attack" and could not breathe. *Id.* at 14. During a February 28 mental health appointment, Blanks reported having about three flashbacks and nightmares about the incident. *Id.* at 9.

In March, Blanks twice requested a medical appointment because he was having "problems out of left ear, due to where I got sprayed by Officer SGT Caple Scotland CI never had problems with my left ear until that incident happened" and "problems out of left ear where O/C pepper spray got down inside it." *Id.* at 7, 11. He reported the same during his associated clinical encounter. *See* Med. Recs. at 23, Docket Entry 62-6.

Caple contends that *Cason v. Lodgson*, No. ELH-11-3089, 2012 WL 3144633 (D. Md. July 27, 2012), where the Court granted summary judgment in favor of the pepper spraying officer, is "[a] factually similar" case. Caple's Mem. in Supp. at 21-22. Cason was an inmate in a Maryland prison when an officer administered one burst of pepper spray through the slot in his cell door. 2012 WL 3144633, at *2.

Cason had become "belligerent and argumentative" when an officer told him he was not on the recreation list and had to return to his cell. *Id.* Once in his cell, he refused to allow the officers to remove his handcuffs. *Id.* This is where the similarities end.

Three officers arrived at Cason's cell to assist in removing his handcuffs. *Id.* They attached an extension tether to the handcuffs and pulled Cason towards the door which he initially prevented from closing. *Id.* After the door closed, officers removed the handcuffs from Cason. *Id.* Once his hands were free, Cason reached out of the slot in his cell door and grabbed the officer's duty belt and refused to let go of the officer. *Id.* Another officer then administered the burst of pepper spray through the cell door. *Id.*

Unsurprisingly, the court found that the evidence "did not support an inference that the defendants acted maliciously and sadistically with the intent to cause harm to Cason." *Id.* at *7. For obvious reasons, the facts of Cason differ from the facts here, most notably Cason's grabbing the officer's duty belt and refusing to let the officer go. No such evidence has been proffered here.

After a thorough review of the evidence, Blanks's story is not "blatantly contradicted by the record." *Iko*, 535 F.3d at 230 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonably jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

There is evidence from which a reasonable jury could find that Caple did not deploy the pepper spray to restore order or the like but, instead, did so in response to intransigence or in retaliation for Blanks's earlier behavior towards Brewington, use of vulgarity, and insolence. There is also evidence from which a reasonable jury could find that Blanks did not pose a threat to the corrections officers or himself, and, thus, there was no need for this use of force. There is also evidence from which a reasonable jury could determine that Blanks suffered injuries from the pepper spray.

In sum, construing the facts and inferences therefrom in Blanks's favor, a reasonable jury could return a verdict in his favor on his § 1983 claim against Caple. Genuine disputes of material fact exist regarding Caple's state of mind when she administered the pepper spray that preclude summary judgment.

The Court should deny Caple's motion for summary judgment.

  D. The Court should deny Caple qualified immunity.

"The doctrine of qualified immunity 'balances two important interests,' namely, the need to hold accountable public officials who exercise power irresponsibly, and the need to shield officials who perform their duties responsibly from 'harassment, distraction, and liability.'" *Byers v. Painter*, 173 F.4th 155, 160 (4th Cir. 2026) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

Qualified immunity shields government officials from civil liability unless a plaintiff shows both (1) that the official violated a constitutional right and (2) that the right was clearly established at the time of the violation. *Pearson*, 55 U.S. at 232.

"In resolving whether to award qualified immunity at summary judgment, courts are to engage in a 'two-pronged inquiry.'" *Nazario v. Gutierrez*, 103 F.4th 213, 230 (4th Cir. 2024) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655 (2014)). First, the court determines whether "in a light most favorable to the injured party – 'the officer's conduct violated a constitutional right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Next, the court asks "whether the right at issue in the first prong was 'clearly established at the time' of the contested action." *Id.* (quoting *Pearson*, 555 U.S. at 227). "Accordingly, a court may award qualified immunity to an official if either (1) there is no violation of a constitutional right, or (2) the constitutional right was not clearly established." *Id.* (citing *Pearson*, 555 U.S. at 227).

13

The court is required to define the constitutional right at a "'high level of particularity'" because "[t]he way in which an alleged right is described matters." *Atkinson v. Godfrey*, 100 F.4th 498, 505 (4th Cir. 2024) (quoting *Ewards v. City of Goldsboro*, 178 F.3d 231, 250-51 (4th Cir. 1999)). "Although a case directly on point is not required, existing precedent 'must have placed the statutory or constitutional question beyond debate.'" *Id.* at 505-06 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).

In the context of a violation of the Eighth Amendment, the Fourth Circuit Court of Appeals requires less specificity in defining the right than in cases involving the Fourth Amendment, but "the unlawfulness must still be 'apparent' based on pre-existing law." *See King v. Riley*, 76 F. 4th 259, 266 (4th Cir. 2023) (citing *Pfaller v. Amonette*, 55 F. 4th 436, 453 (4th Cir. 2022) and quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "In the end, the key inquiry is whether 'the law provided "fair warning" that [the officer's] conduct was unconstitutional.'" *Atkinson*, 100 F.4th at 506. (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (alteration in *Booker*)). To answer that question, courts look to precedent of the United States Supreme Court and, in this district, the Fourth Circuit Court of Appeals. *Id.*

In relation to Caple's conduct, the constitutional right at issue is the right of an inmate particularly one who is restrained in handcuffs in a locked cell to be free from the use of excessive force. *See id.* (explaining that "the clearly established right must be viewed with reference to the particular facts of the case").

Where, as here, genuine disputes of material fact "preclude summary judgment on [the plaintiff's] claim of [the use of excessive force], [t]hese disputes necessarily also preclude summary judgment on the first step of the qualified immunity inquiry." *Bolick v. Anderson*, 169 F.4th 528, 540 (4th Cir. 2026); *see also Buonocore v. Harris*, 65 F.3d 347, 359-360 (4th Cir. 1995) (citations omitted) ("If a plaintiff has alleged a clearly established right, summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct."); *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 179 (4th Cir. 1998) ("When resolution of a case depends on determining what actually happened, 'the issue is inappropriate for resolution by summary judgment.'" (quoting *Rainey v. Conerly*, 973 F.2d 321, 324 (4th Cir. 1992))).

As previously discussed, there exist genuine disputes of material facts regarding whether Caple violated Blanks's Eighth Amendment right when she administered pepper spray. Therefore, the Court "proceed[s] to the second step: whether the right was

14

clearly established." *Bolick*, 169 F.4th at 540.

At the time of the incident, "it was clearly established that a corrections officer's use of force in bad faith – not to preserve order or induce compliance, but to punish through the 'wanton infliction of pain' – violates an inmate's Eight Amendment right." *Brooks*, 924 F.3d at 119. "That principle applies with particular clarity to cases . . . where the victim is restrained, compliant, and incapable of resisting or protecting himself, and otherwise presents no physical threat in any way." *Thompson v. Commonw. of Va.*, 878 F.3d 89, 105 (4th Cir. 2017).

More than three decades ago, the Fourth Circuit Court of Appeals recognized "'that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas *or other chemical agents in quantities greater than necessary* or for the sole purpose of infliction of pain." *Iko*, 535 F.3d at 240 (emphasis in original) (quoting *Williams*, 77 F.3d at 763 and stating that the phrase "or other chemical agents" "plainly reaches the use of pepper spray").

A "'reasonable officer would have understood that'" "(without warning) pepper spray[ing] a prisoner who was fully restrained inside of a locked cell because that prisoner was kicking the door seeking the help of an officer" "'was unlawful, whether by then-existing precedent or by the otherwise obvious illegality of that outrageous conduct.'" *Ransom v. Page*, No. 7:23-

CV-166-M, 2025 WL 77897, at *9 (E.D.N.C. Jan. 10, 2025) (quoting *Martin v. Short*, No. 23-1588, 2024 WL 3200715, at *4 (4th Cir. June 27, 2024)).

Further, though not dispositive, the NCDAC Policies and Procedures clearly state that "[a]n officer is prohibited from using force solely as a result of verbal provocation. An officer shall not use force against an offender . . . who is effectively restrained." Use of Force Policy, Docket Entry 65-5 at 3.

Because genuine disputes of material facts exist about Caple's use of force and the right of an inmate handcuffed inside a locked cell to be free from the use of excessive force was clearly established at the time of the incident, summary judgment on Caple's defense of qualified immunity is not appropriate. The Court should not grant it at this stage.

> E. The Court should grant in part and deny in part Ricker's motion for summary judgment.

Next, Blanks asserts that Ricker threatened to spray him by pulling out her pepper spray and then ordering Caple to deploy her own spray. *See* Compl. § IV.D.; Verified Br. in Supp. at 15.

As to the first allegation, Ricker herself reported that she "pulled [her] spray but then saw 3 sergeants standing behind [her]." Witness Statements at 6. *See also* Caple Resps.

to Admis. ¶ 11 (stating the same). But appellate courts have agreed that threats alone cannot provide a basis for a § 1983 suit. *See Henslee v. Lewis*, 153 F. App'x 178, 180 (4th Cir. 2005) (unpublished) ("Mere threats or verbal abuse by prison officials, without more, do not state a cognizable claim under § 1983.") (citing *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979)); *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) ("[M]ere allegations of verbal abuse, threats or defamations by a correctional officer to a prisoner are not cognizable in a Section 1983 action . . . ."); *King v. Olmsted County*, 117 F.3d 1065, 1067 (8th Cir. 1997) ("[A] threat constitutes an actionable constitutional violation only when the threat is so brutal or wantonly cruel as to shock the conscience . . . or if the threat exerts coercive pressure on the plaintiff and the plaintiff suffers the deprivation of a constitutional right."); *Robertson v. City of Plano*, 70 F.3d 21, 24 (5th Cir. 1995) ("[M]ere threatening language or gestures of a custodial office[r] do not, even if true, amount to constitutional violations.") (citation omitted).

This case is lacking the "something more." Ricker's threat to pepper spray Blanks was just that: she stopped short of carrying out that threat.

As for Ricker's order for Caple to deploy her pepper spray, the undisputed facts foreclose the claim, which sounds in supervisory liability.

"In a § 1983 suit . . . the term 'supervisory liability' is a misnomer." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). A supervisor can only be liable under § 1983 for "their *personal* wrongdoing or supervisory actions that violated constitutional norms." *Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (emphasis added). The supervisor's "'indifference or tacit authorization'" of "a constitutional violation committed by a subordinate state or local government official" must be "'a causative factor' in enabling the violation." *Bolick*, 169 F.4th at 541 (quoting *Shaw v. Stroud*, 13 F.3d 791, 798-99 (4th Cir. 1994)). To determine if a supervisor is liable, courts "must consider whether the supervisor's own 'deliberate indifference permitted the constitutional abuses to continue unchecked.'" *Id.* (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)).

A plaintiff must show

> (1) that the supervisor had actual or constructive knowledge that [her] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional [or other legal] injury to citizens like the plaintiff;
>
> (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference

16

to or tacit authorization of the alleged offensive practices; and

(3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional [or other legal] injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799.

This claim of supervisor liability against Ricker fails from the start. The undisputed evidence shows that Ricker was not Caple's supervisor. Caple was also a higher rank than Ricker and Ricker's superior. *See* Ricker Decl. ¶ 13; Ricker's Resps. to Pl.'s Interrogs. ¶¶ 12, 20. Blanks presents no evidence otherwise.

In addition to sounding in supervisory liability, this claim could be one based on the theory of bystander liability against Ricker. *See* Verified Br. in Opp'n at 2 (stating "[t]he officers who were present failed to protect Plaintiff Blanks from certain doom"); *id.* at 16 ("Ricker . . . stood there and watched Caple [administer] pepper to Plaintiff Blanks."); *see generally also* Tim Caesar Blanks' Decl. in Opp'n, Docket Entry 73 (stating the same).

Such a claim is "premised on an officer's 'affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers.'" *Johnson v. Robinette*, 105 F.4th 90, 123-24 (4th Cir. 2024) (quoting *Randall v. Prince*

*George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002)).

An officer can be liable under this theory when she "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall*, 302 F.3d at 204. "The 'bystanding officer must know of [her] fellow officer's misconduct . . . . If the bystander lacks such knowledge, [she] cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible.'" *Johnson*, 105 F.4th at 124 (quoting *Randall*, 302 F.3d at 204 n.24).

Despite Ricker's argument otherwise, there are genuine disputes of material facts about her knowledge of a constitutional violation, opportunity to stop Caple, and choice not to act. For example, Ricker reported that she would not have administered pepper spray under these circumstances because Blanks "was secured at the time, and even though he was angry and yelling, he did not pose a threat to anyone," Dismissal Letter at 4, implying she knew doing so would be excessive force. On the other hand, as described above, there are genuine disputes of material fact about whether Caple violated Blanks's constitutional rights as a threshold matter. In addition, as part of the incident investigation, Ricker stated that she told Caple, Gholston, and Graham, "I'm not sure if I can spray him but you're three sergeants, you decide," *id.* at 4-5, implying Ricker did

not know if the administration of pepper spray would be excessive under those circumstances.

Similarly, there is evidence from which a jury could find that Ricker did not have a reasonable opportunity to stop Caple. Ricker averred that "Caple took out her pepper spray canister and administered a burst of pepper spray" "[w]ithout warning." Ricker Decl. ¶ 10. Further, she stated that "[a]t no time before or during the use of force incident did [she] know or even suspect that Sergeant Caple would use pepper spray against" Blanks, the "incident happened quickly and surprised [her]" such that she "did not have time to react before Sergeant Caple had already finished administering pepper spray." *Id.* ¶ 14. Gholston similarly described Caple's administration of the pepper spray as "immediate[]." Dismissal Letter at 5. Under these circumstances, Ricker would not have had a reasonable opportunity to stop Caple or make the choice not to act. On the other hand, her telling Caple, Graham, and Gholston to decide what to do implies she had time to stop the administration of pepper spray and chose not to do so.

Considering all inferences in Blanks's favor, a reasonable jury could find Ricker liable for bystander liability.

Ricker disputes liability, albeit for general use of excessive force, because there is evidence that Blanks did not suffer injuries from the pepper spray. *See* Mem. in Supp. of Sessoms,

Brewington, and Ricker's Mot. for Summ. J. at 11, Docket Entry 65. But the cases she cites for support, *Hamilton v. Roederer Corr. Complex*, No. 3:20-CV-P160-DJH, 2020 WL 4587524 (W.D. Ky. Aug. 10, 2020) and *Jennings v. Mitchell*, 93 F. App'x 723 (6th Cir. 2004) (unpublished), are distinguishable. The *Hamilton* court dismissed the complaint on 28 U.S.C. § 1915A review because the plaintiff alleged no injury, and the *Jennings* court affirmed summary judgment for the correction officer because the undisputed evidence showed lawful use of pepper spray and no respiratory distress. Here, genuine issues of material fact remain regarding Caple's actions' legality.

Accordingly, the Court should grant in part Ricker's motion for summary judgment as to the § 1983 claims based on threats and supervisory liability and deny in part Ricker's motion for summary judgment as to the § 1983 claim of bystander liability.

F. The Court should deny Ricker qualified immunity.

The constitutional right of an inmate in handcuffs inside a locked cell to be free from excessive force was clearly established on February 6, 2024, as previously explained. The material disputes surrounding Caple's conduct, as well as Ricker's, foreclose the award of qualified immunity to Ricker at this stage. *See Bolick*, 169 F.4th at 541.

The Court should deny Ricker qualified immunity.

G. The Court should grant Brewington's motion for summary judgment.

Blanks's primary claim against Brewington is that she instigated the excessive force by reporting his disruptive behavior. Compl. § IV.D. ("Brewington started the whole situation by saying I made threats and was kicking door, she lied"); Verified Br. in Supp. at 15 ("Brewington gave false information, that the Plaintiff was kicking his assigned cell door, shouting threats, which started the whole incident.").[4]

In § 1983 suits, liability will only lie where the official charged *acted personally* in the deprivation of the plaintiff's rights. *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (emphasis added) (quotations omitted).

To meet her burden as the moving party, Brewington avers: she told Blanks he would not be released from his cell to help her clean the unit; she told him to stop kicking his cell door; and she called for assistance. Brewington Decl. ¶¶ 6-12. That was the extent of her interaction with Blanks on February 6. After Caple and Ricker removed him from the holding cell on her unit, she did not see Blanks again that shift. *Id.* ¶ 13. Therefore, she was not present during the incident. *Id.* Furthermore, none of

the witness statements from the incident, including Blanks's statement, place Brewington there. *See, e.g.* Dismissal Letter at 4-6. The summary of the video footage of the incident does not mention Brewington at all. *See, e.g., id.* at 6.

Although Blanks did not place Brewington at the incident when he gave his witness statement, he does state in his verified brief in opposition to the defendants' motions that Brewington "stood there" when Ricker and then Caple pulled out their pepper spray. *See* Verified Br. in Opp'n at 16. But the record evidence blatantly contradicts this statement such that no reasonable jury would believe Brewington was present for the use of force incident; therefore, the Court will "not adopt that version of the facts for purposes of ruling on [the] motion for summary judgment." *See Iko*, 535 F.3d at 230.

Because it is undisputed that Brewington did not act personally in the alleged deprivation of Blanks's rights, the Court should grant Brewington summary judgment.

H. The Court should grant Brewington qualified immunity.

Because the undisputed evidence shows that Brewington did not violate Blanks's rights, she is entitled to qualified immunity. *See Bolick*, 169

---

[4] Likely out of an abundance of caution, Brewington argues that she cannot be liable under the theories of bystander or

supervisory liability. The Court does not read Blanks' complaint to allege such theories against Brewington.

F.4th at 540 ("Answering either question [of the two-step qualified immunity inquiry] in the negative warrants granting qualified immunity.").

I. The Court should grant Sessoms' motion for summary judgment.

Finally, Blanks alleges that Sessoms violated his constitutional rights by telling officers to leave him in the holding cell for ten minutes after Caple deployed her pepper spray. Verified Br. at 2, 15. Essentially, Blanks claims she was deliberately indifferent to his serious medical needs.[5]

More specifically, Blanks contends that "when Ricker asked Sessoms, what do you want us to do with him? Sessoms replied, 'leave him in there for 10 minutes!'" *Id.* at 2. "[T]hats when SGT David D Graham finally spoke up and said, 'Alright, I've had enough of this crap!' SGT David Graham made his way through to unlock the holding cell and begged Plaintiff Blanks to take a cold shower." *Id.* According to the undisputed summary of the video footage of the incident, David Graham removed Blanks from the cell approximately four minutes after Sessoms arrived in the holding cell area. *See* Dismissal Letter at 6.

Sessoms did not remember Ricker asking her what to do with Blanks or what she told Ricker in response. *See* Sessoms's Resps. to Pl.'s Interrogs. ¶ 24. "After reviewing his control actions and the incident report, I probably told her to place him in the holding cell." *Id.* She did "not remember saying to leave [Blanks] inside the holding cell for any period of time." *Id.* ¶ 23. Sessoms also did not remember "the scene after SGT. David D. Graham stat[ed], 'I've had enough of this crap!,' before freeing Plaintiff Blanks from the locked holding cell . . . ." *Id.* ¶ 25.

Policy required the officers to give Blanks "an immediate opportunity to flush his or her eyes with water once control has been restored." *See* NCDAC Use of Force Policy at 5. And Gholston, David Graham, and Lenwood Graham escorted Blanks to the showers to be decontaminated minutes after Caple sprayed him. Statements of Witnesses at 2, 9, 10.

Afterwards, at approximately 10:50 p.m., Toni Nguyen and Antonio Tolbert took Blanks from his cell in the Blue Unit for a medical assessment. *Id.* at 4, 11, 23. Blanks complained of his "hands burning a little bit" and his eyes burning. Med. Recs. at 21-22, Docket Entry 68. The nurse assessed him, reported "no visible sign of OC spray" on his face and "no skin swelling, redness, or blistering anywhere" on his body, and

---

[5] Likely out of an abundance of caution, Sessoms argues that she cannot be liable under the theories of bystander liability

or supervisory liability. The Court does not read Blanks' complaint to allege either of these theories against Sessoms.

saw no other injuries. Dismissal Letter at 6. Officers also "kept a visual" on Blanks for one hour. *E.g.*, Statements of Witnesses at 4.

Days following the incident, Blanks wrote to his therapist requesting a mental health visit and explaining that as a result of the incident, his PTSD "kicked in," he "suffered a panic attack," "couldn't breathe," and was "having flash backs." Med. Recs. at 14. In addition, he sought medical treatment to address "problems with [his] left ear" that developed after "that incident happened." *Id.* at 7, 11.

The undisputed evidence shows that, no matter what Sessoms said to do with Blanks after Caple sprayed him, David Graham removed him from the cell approximately three minutes after Sessoms was seen outside of the cell and approximately five minutes after Caple sprayed him. David Graham and other officers then escorted Blanks to the showers to decontaminate. Approximately forty-five minutes after Caple sprayed him, officers took Blanks for a medical assessment. This delay, without more, is not enough to show a constitutional violation. *See Moskos*, 24 F.4th at 298.

In *Moskos*, the inmate claimed that prison officials were deliberately indifferent to his serious medical needs "because they delayed decontaminating him after he was sprayed with pepper spray." *Id.* at 297. As the *Moskos* court recognized when it affirmed judgment as a matter

of law on the inmate's deliberate indifference to serious medical needs claim:

> Moskos experienced the usual transitory effects of pepper spray for a period of, at most, 90 to 120 minutes. He did not testify to a serious medical reaction or to any pain beyond the normal discomfort of pepper spray: even by his own account, he simply expressed that his eyes were burning, not that he was experiencing more serious medical issues. In circumstances such as these, involving a short delay in decontamination, without any aggravating factors such as a serious medical reaction, courts have consistently found that the objective prong is not satisfied.

*Id.* at 298.

Here, as in *Moskos*, there is no evidence that any delay in decontamination or medical treatment stemming from Sessoms' orders "put him at a 'substantial risk' of 'serious harm,'" as is required for a deliberate indifference claim. *Id.* The mental health harm Blanks reported arose from the incident itself, not any delay in treatment for the pepper spray.

Accordingly, the Court should grant Sessoms summary judgment on the deliberate indifference claim.

21

J. The Court should grant Sessoms qualified immunity.

Because the undisputed evidence shows that Sessoms did not violate Blanks's rights, she is entitled to qualified immunity. *See Bolick*, 169 F.4th at 540 ("Answering either question [of the two-step qualified immunity inquiry] in the negative warrants granting qualified immunity.").

V.    CONCLUSION

**IT IS HEREY ORDERED** that the Clerk redact Tim Caesar Blanks's date of birth from pages 7, 9, 11, 13, 14, 21, and 22 of Docket Entry 68 and refile those pages as publicly available;

**IT IS FURTHER ORDERED** that the Clerk seal Docket Entry 62-6, redact Tim Caesar Blanks's date of birth from page 23 of Docket Entry 62-6, and refile that page as publicly available;

**IT IS HEREBY RECOMMENDED** that the Court:

1. **DENY** Tim Caesar Blanks's Motion for Summary Judgment,

2. **GRANT IN PART** Charlene Nicole Caple's Motion for Summary Judgment as to the official capacity claim against her, and **DENY IN PART** the remainder of her motion,

3. **GRANT IN PART AND DENY IN PART** Jessica Ricker's, Jasmine Brewington's, and Angela Sessoms' Motion for Summary Judgment as follows:

   i.   **GRANT IN PART** as to the official capacity claim and the portions of the § 1983 claim based on threats and supervisory liability against Jessica Ricker, and **DENY IN PART** the remainder of her motion,
   ii.  **GRANT** Jasmine Brewington's motion, and
   iii. **GRANT** Angela Sessoms' motion.

_____
JoAnna Gibson McFadden
United States Magistrate Judge

July 24, 2026

22